UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-20150-Civ-Lenard/Goodman

ROY R. LUSTIG,

    Plaintiff,

v.

BARBARA STONE,

    Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON PLAINTIFF'S DAMAGES

United States District Judge Joan A. Lenard referred to the Undersigned the issue of calculating Plaintiff's damages after entry of a default against Defendant Barbara Stone. [ECF No. 37]. The Undersigned conducted an evidentiary hearing on July 8, 2015 [ECF Nos. 52; 53]. Having reviewed the evidence, including the testimony and exhibits presented at the hearing and the exhibits to the Plaintiff's Amended Complaint [ECF No. 5], the Undersigned **respectfully recommends** that the District Court award the Plaintiff **$700,000 in compensatory damages and $1 million in punitive damages**. The Undersigned further **respectfully recommends** that the District Court enter the **injunctive relief** as more fully set forth below in favor of the Plaintiff.

**I.      BACKGROUND**

Plaintiff Roy R. Lustig filed this action seeking compensatory and punitive damages and injunctive relief based on Defendant Barbara Stone's professional and personal disparagement of Lustig. [ECF No. 5]. Lustig asserted claims against Stone for defamation *per se*, intentional infliction of emotional distress, and interference with an advantageous business relationship. [ECF No. 5]. Default was entered against Stone when she failed to comply with a number of Orders entered by District Judge Lenard and the Undersigned. [ECF Nos. 35; 36]. The case was then referred to the Undersigned for a determination of the Plaintiff's damages. [ECF No. 37].

**II.     DISCUSSION – COMPENSATORY DAMAGES**

      **A.      Lost Earnings or Earning Capacity**

           1.      *Applicable Legal Standard*

A person damaged by another's wrongful act is entitled to recover fair and just compensation commensurate with the injury or loss resulting from that act. *MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 223 (Fla. 2008). As such, the plaintiff can receive compensatory damages for the injury or loss caused by the defendant's act. *Id.* Compensatory damages are generally "designed to make the injured party whole to the extent that it is possible to measure such injury in monetary terms." *Id.*

An award of compensatory damages is proper if there is some reasonable basis in the evidence to support the amount awarded. *See Jet 1 Ctr., Inc., v. City of Naples Airport Auth. (In re Jet 1 Ctr., Inc.)*, 335 B.R. 771, 788 (M.D. Fla. 2005). Although damages must be proven with "some degree" of certainty, the inability of the plaintiff to give the precise amount of damages does not preclude recovery where it is clear that he suffered substantial damages. *Id.*

Compensatory damages for defamation include any earnings lost in the past and any loss of ability to earn money in the future. Fla. Std. Jury Instr. (Civ.) 405.10(d); *Saadi v. Maroun*, No. 8:07-cv-01976-T-24-MAP, 2009 WL 3617788, at *1 (M.D. Fla. Nov. 2, 2009) (plaintiff awarded $25,000 on his defamation claim for lost earnings in the past and loss of ability to earn in the future). A claimant may recover damages for a defamation that "tends to be prejudicial to him in the conduct of his trade or business or to deter third persons from doing business with him." *Rety v. Grenn*, 546 So. 2d 410, 423 (Fla. 3d DCA 1989), *review denied*, 553 So. 2d 1165 (1989); *accord Kilgore Ace Hardware, Inc. v. Newsome*, 352 So. 2d 918, 920 (Fla. 2d DCA 1977). In *Rety*, the appellate court affirmed an award of $2,500,000 in compensatory damages based on evidence establishing that the defendant's defamation lead to a drastic decrease in gross sales at, and ultimately the financial ruin of, the plaintiff's restaurant. 546 So. 2d at 423.

Damages for tortious interference likewise include lost earnings from an identifiable business relationship. *See, e.g., Landry v. Hornstein*, 462 So. 2d 844, 847 (Fla.

3d DCA 1985) (damages for interference with business relationship included loss of purchaser for business and proceeds of negotiated sale of about $35,000).

    2.    *Analysis*

Lustig introduced evidence at the hearing showing that Stone's actions had caused him to lose earnings of at least $200,000. In particular, a member of a limited liability company had accepted Lustig's engagement letter to represent the company in litigation against the managing director and others in a national brokerage company, a law firm and asset fund managers, for self-dealing, breach of fiduciary duty, and conflict of interest in blocking conversion of the company's notes and non-payment of the company's affairs. (Trial Ex. 31). Lustig's engagement letter called for the payment of a $100,000 retainer against his hourly billing rate in federal court of $550 per hour. (*Id.*). Testimony at the hearing by Lustig and the member indicated that it was expected that initially the total billings in the matter would be approximately $200,000 to bring the matter to a point for negotiation.

After the member accepted Lustig's engagement letter, however, his partners searched the internet for "easily spotted conflicts or reputation risk." (*Id.*). A search of Lustig's name revealed "a number of recent postings and reports regarding [Lustig] and [his] clients and the claims that [he had] stolen funds from [his] partners, clients, charities, and handicapped individuals." (*Id.*). Specifically, the member testified that his partners had seen internet postings by Stone that accused Lustig of: "taking . . . money

4

from charity organizations like the United Cerebral Palsy Association of Miami, Inc. . . . and a lot of other Non Profit Organizations" (Trial Ex. 3); "using funds for his private and expensive way of life from disabled people who cannot help themselves" (*Id.*); committing "criminal acts to control . . . disabled elderly persons [who] are drugged, chemically restrained and isolated from their loved ones," including engaging in a "staged liquidation to take their money" (Trial Ex. 2); orchestrating the isolation of Stone's mother in order to take her life and steal her assets (Trial Ex. 19); and masterminding a "criminal enterprise," akin to the Third Reich, responsible for the premeditated murder and other atrocities against Stone's mother and other elderly and disabled citizens (Trial Ex. 1). Based on those postings by Stone, the company determined not to hire Lustig to conduct the litigation on behalf of the company. (Trial Ex. 31).

In light of the foregoing evidence, the Undersigned concludes that there is a reasonable basis in the evidence to support an award of $200,000 to Lustig for lost earnings caused by Stone's actions.

### B. Injury to Reputation or Health: Shame, Humiliation, Mental Anguish, and Hurt Feelings

1. *Applicable Legal Standard*

Compensatory damages for defamation are not limited to out-of-pocket loss. *Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007). Instead, the plaintiff may recover damages resulting from any injury to his

5

reputation and standing in the community, even if there is no evidence that assigns an actual dollar value to the injury. *Id.* at 1259-60; *see also* Fla. Std. Jury Instr. (Civ.) 405.10(a); *NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1254 (Fla. 4th DCA 2011) (jury was properly instructed that plaintiff could recover damages for "[a]ny injury to reputation experienced in the past or to be experienced in the future"), *review denied*, 92 So. 3d 213 (Fla. 2012). Such damages are presumed in a case of defamation *per se*, where the defendant's statements impute to the plaintiff some conduct, characteristic, or condition incompatible with the proper exercise of his lawful business, trade, or profession. *NITV*, 61 So. 3d at 1254.

The plaintiff may also recover damages for any injury to his health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past or to be experienced in the future as a result of the defamation. *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1314 (M.D. Fla. 2010); Fla. Std. Jury. Instr. (Civ.) 405.10(a). "There is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in the light of the evidence." Fla. Std. Jury. Instr. (Civ.) 405.10(a); *accord Buis*, 504 F. Supp. 2d at 1260; *NITV*, 61 So. 3d at 1254.

In *NITV*, for example, the plaintiff was unable to produce competent evidence relating to lost past or future earnings but was still awarded $250,000 for damage to his reputation. 61 So. 3d at 1253-54. The appellate court affirmed that part of the award,

6

noting that there was "little doubt that a jury could conclude that NITV intended to impugn Baker's integrity and damage his reputation" by publishing statements referring to Baker's business as a scam and accusing him of being unfit to be in his chosen business. *Id.* at 1254. Similarly, the district court in *Coton* awarded the plaintiff $100,000 as compensatory damages for the defendants' defamatory use of the plaintiff's photograph to market a pornographic video, which caused the plaintiff personal and professional humiliation severe enough to harm her career. 740 F. Supp. 2d at 1314-15.

Mental anguish is also a compensable element of a claim for intentional infliction of emotional distress. *See, e.g., Saludes v. Republica De Cuba*, 655 F. Supp. 2d 1290, 1295-96 (S.D. Fla. 2009) (awarding $2.5 million in compensatory damages for plaintiffs' mental anguish).

    2.    *Analysis*

Lustig introduced substantial evidence showing that Stone had published many statements that were injurious to his reputation and standing in the community and imputed to Lustig conduct and characteristics incompatible with the proper exercise of his profession as a lawyer and his mortgage lending and real estate businesses. Some of those statements are detailed above, including that Lustig stole money from charity organizations and disabled elderly persons. (Trial Exs. 2, 3, 19). That is just the tip of the iceberg.

Stone also used a fake email account to pose as Lustig and direct threats at Lustig and his business partner about investigations against their company along with a homophobic insult at Lustig's daughter's boyfriend. (Trial Ex. 8). Stone used the same account to email Lustig's business partner again and state that Lustig was committing "ruthless and unethical acts" and to draw his attention to the various internet sites where Stone had posted her scurrilous accusations against Lustig. (Trial Ex. 11). In other emails to Lustig's business partner (and Lustig's wife and daughter), Stone indicated that Lustig had engaged in "heath insurance fraud [that] will soon be investigated" (Trial Ex. 23), and that his partner should have a member of the family who is a state attorney "find out what Roy Lustig is doing!" (Trial Ex. 22).

After the internet postings detailed above that caused Lustig to lose at least one significant client with a pending case, Stone posted additional accusations that Lustig: is an "adult predator and like a child molester must be barred from contact with vulnerable adults" (Trial Ex. 25); has "extorted over $400,000" from Stone's mother (*Id.*); is "engaged in a pattern and practice of abuse and embezzlement" (*Id.*); has "repeatedly filed fraudulent staged litigations" (*Id.*); is a "terrorist[] and criminal[]" "as vicious as ISIS terrorists" (*Id.*); is a "criminal disguised as an attorney" (Trial Ex. 30); and engaged in the "human trafficking" of Stone's mother and "extorting and money laundering [of] her assets" (*Id.*).

In addition to posting on various internet sites and emailing Lustig's business partner, Stone also emailed similar accusations against Lustig to scores of individuals and organizations, including all of the justices of the Florida Supreme Court, filing complaints with the Florida Bar and many representatives of the Florida and U.S. governments, and many national and local news organizations. These emails included claims that Lustig: prepares fraudulent bills (Trial Exs. 21, 26, 27); changes court transcripts (Trial Ex. 21); makes "fraudulent court filings" (Trial Ex. 29); is "in a frenzy to empty [Stone's] mother's assets and cause her death to shield and cover up [his] conduct" (Trial Ex. 21); is a "body snatcher" and "an adult predator and like a child molester should be barred from involvement with elderly adults" (Trial Exs. 26, 27); is a "diabolical fraudster" (Trial Ex. 26); is a "thug attorney" and a "habitual liar" engaged in "fraud and lies and embezzlement" (*Id.*), as well as "fraud, perjury, extortion and [other] felony crimes" (Trial Ex. 29); and is "masterminding the criminal racketeering enterprise that is engaged in the attempted pre-meditated murder of my mother," while "extort[ing] over $250,000" from her (Trial Ex. 29).

In addition to repeatedly disparaging Lustig professionally, Stone also engaged in a variety of personal attacks on Lustig, and his wife and daughter, as well. In a letter to the justices of the Florida Supreme Court, Stone accused Lustig of engaging in an "inappropriate romantic relationship" with the senior staff attorney of the Florida Bar's Lawyer Regulation Department. (Trial Ex. 29). Posing as Lustig, Lustig's daughter, and

9

others, Stone sent a variety of emails to Lustig's daughter, many of which were also sent to Lustig, stating that Lustig's daughter: has an ugly nose, face, and "c_nt" (Trial Exs. 7, 9); should "start playing in a circus" (Trial Ex. 12); is a "little c_nt" and an "ugly c_nt" (Trial Exs. 12, 15); eats cat food (Trial Ex. 13); and takes drugs (Trial Ex. 16).

Many of the emails attached pictures of Lustig's daughter and/or other family members. (Trial Exs. 12, 13, 14, 15). Stone sent another email to Lustig's wife and daughter, with an attached photograph of Lustig's daughter, stating that Lustig's daughter is stupid and "so ugly like MAMA!" (Trial Ex. 20). Stone included a photograph of Lustig and his wife in her post on ripoffreport.com where she accused Lustig of having committed criminal acts to control disabled elderly persons and take their money. (Trial Ex. 2). Stone copied Lustig's wife on another email to Lustig, informing them that she had posted another new report about Lustig on ripoffreport.com. (Trial Ex. 17).

Lustig credibly testified that Stone's repeated attacks on him professionally and personally injured his reputation and standing in the community and caused him to suffer shame, humiliation, mental anguish, and hurt feelings. Lustig indicated that Stone's actions had damaged his relationships with his wife, daughter, and business partner, causing crises in his family and work lives. Lustig was eventually forced to see a doctor to obtain a prescription medication to deal with the emotional distress caused by Stone's actions.

In light of all of the foregoing evidence concerning Stone's negative statements about Lustig directed at him, his family, his business partner, the legal community, news organizations, and anyone in the community at large with an internet connection, the Undersigned concludes that there is a reasonable basis in the evidence to support an award of $500,000 to Lustig for injury to his reputation and health, and for shame, humiliation, mental anguish, and hurt feelings suffered as the proximate result of Stone's actions.

## III.   DISCUSSION – PUNITIVE DAMAGES

### A.   <u>Applicable Legal Standard</u>

Under Florida law, punitive damages are recoverable in any case in which the defendant was personally guilty of intentional misconduct or gross negligence. Fla. Stat. § 768.72(2). "Intentional misconduct" means that the defendant "had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla. Stat. § 768.72(2)(a). "Gross negligence" means that "the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(2)(b). Because intentional misconduct is required to establish either intentional infliction of emotional distress or tortious interference with a business relationship, punitive damages are recoverable under both

of those causes of action. *See, e.g., Donigan v. Nevins*, 785 So. 2d 573, 575 (Fla. 4th DCA 2001) ("To state a cause of action for the intentional infliction of emotional distress, a complaint must allege facts which, if proven, would also support an award of punitive damages."); *Platte' v. Whitney Realty Co.*, 538 So. 2d 1358, 1360 (Fla. 1st DCA 1989) (punitive damages recoverable for intentional interference with a business relationship); *Puga v. Suave Shoe Corp.*, 427 So. 2d 288 (Fla. 3d DCA 1983) (same).

Punitive damages may also be the primary relief for a claim of defamation *per se*. *Roca Labs, Inc. v. Randazza*, No. 8:14-cv-3014-T-24-MAP, 2015 WL 248762, at *3 (M.D. Fla. Jan. 20, 2015) (citing *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010) ("[W]hen the claim is defamation *per se*, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages."), *review denied*, 36 So. 3d 84 (Fla. 2010), *cert. denied*, 131 S. Ct. 905 (2011)). Punitive damages are warranted if the defendant's primary purpose in making the defamatory statement "was to indulge ill will, hostility, and an intent to harm" the plaintiff. Fla. Std. Jury Instr. (Civ.) 405.10(g)(1); *accord Coton*, 740 F. Supp. 2d at 1315.

Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for her wrongful conduct and to deter similar misconduct by her and other actors in the future. *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1216 (11th Cir. 2010) (citing *Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999)), *cert. denied*, 562 U.S. 890 (2010). Punitive damages are based on the

nature, extent, and degree of the defendant's misconduct. *Brown v. Ford*, 900 So. 2d 646, 648 (Fla. 1st DCA), *review denied*, 911 So. 2d 792 (Fla. 2005). In *Sadow*, the appellate court held that in light of the defendant's reprehensible conduct in "set[ting] out to destroy Dr. Sadow's career in the community," the jury's award of $5 million in punitive damages conformed to applicable law and was neither excessive nor arbitrary so as to exceed federal constitutional norms. 43 So. 3d at 731, 734.

Punitive damages generally may not exceed the greater of three times the amount of compensatory damages awarded to the plaintiff, or $500,000. Fla. Stat. § 768.73(1)(a). But there is no cap on punitive damages if "at the time of injury the defendant had a specific intent to harm the claimant" and "the defendant's conduct did in fact harm the claimant." Fla. Stat. § 768.73(1)(c); *see also Myers*, 592 F.3d at 1216 (for an award of punitive damages greater than $500,000 to stand, there must be both specific intent to harm and actual harm); *Sadow*, 43 So. 3d at 729 ("[A] finding of liability for slander *per se*, coupled with an express finding that the slander was intended to injure plaintiff and did in fact cause injury, authorizes the jury to consider and assess punitive damages without any finding of an amount of compensatory damages."). Even in cases where there is no cap under Florida law, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution[.]" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

B.     Analysis

The sheer volume and incendiary quality of Stone's vituperative statements about Lustig demonstrate that she was acting solely to "indulge ill will, hostility, and an intent to harm" Lustig in making the statements. Fla. Std. Jury Instr. (Civ.) 405.10(g)(1). Had she acted for any other purpose, there would have been no reason for her to also aim her crude attacks at Lustig's family and business partner. Stone's actions demonstrate that her only motivation was to inflict as much damage as possible on Lustig, both personally and professionally. Accordingly, the Undersigned finds that Stone had actual knowledge of the wrongfulness of her conduct and the high probability that injury or damage to Lustig would result, and that despite that knowledge, Stone intentionally pursued that course of conduct, resulting in injury or damage to Lustig, such that an award of punitive damages is appropriate under Florida law. Fla. Stat. § 768.72(2).

The Undersigned has already found that Stone specifically intended to harm Lustig and that her conduct actually harmed him by injuring his reputation and health and causing him mental anguish and emotional distress, just as Stone intended. As such, the amount of punitive damages to be awarded to Lustig is not subject to the statutory cap.

The nature, extent, and degree of Stone's misconduct in this case are considerable. She set out to destroy Lustig's legal and business careers by branding him

as a criminal actor, racketeer, thief, and murderer, among many other things. Stone also aimed to destroy Lustig's personal life by involving his wife and daughter in her vendetta against Lustig. Such misconduct cannot be tolerated in a civilized society and must be deterred by a strong message to Stone and other actors in the future. As a result, the Undersigned concludes that an award of punitive damages in the amount of $1 million is appropriate in this case (where compensatory damages are $700,000).

## IV.   DISCUSSION – INJUNCTIVE RELIEF

### A.   Applicable Legal Standard

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A plaintiff seeking a permanent injunction must demonstrate that: (1) he suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *Id.*; *Luxottica Grp. S.p.A. v. Casa Los Martinez Corp.*, No. 1:14-cv-22859-JAL, 2014 WL 4948632, at *3 (S.D. Fla. Oct. 2, 2014).

Under Florida law, equity will not enjoin actual or threatened defamation in the absence of some other independent ground. *Saadi*, 2009 WL 3617788, at *1. An "independent ground" sufficient to invoke equitable jurisdiction and permit the

issuance of an injunction in a defamation case exists when "an action at law would not be a complete, prompt efficient remedy." *Id.* (quoting *Wynn Oil Co. v. Purolator Chem. Corp.*, 536 F.2d 84, 86 (5th Cir. 1976)).

The district court found that no such remedy was afforded to the plaintiff in *Saadi*, about whom the defendant had posted defamatory statements on internet blogs and forums, even though the plaintiff was awarded compensatory damages of $30,000 -- $5,000 for medical care and $25,000 for lost earnings in the past and loss of ability to earn in the future -- and $60,000 in punitive damages. *Id.* Despite the award, the defendant had not taken down several defamatory internet postings that the plaintiff argued would cause "continuing damage to his reputation and loss of business." *Id.* at *2.

Under those circumstances, the court concluded that the judgment was not providing the plaintiff with a complete remedy, and as such, an injunction was appropriate. *Id.* The court reasoned that money damages cannot always provide the only remedy for defamation because that "would mean that a defendant harmed by a continuing pattern of defamation would be required to bring a succession of lawsuits if an award of damages was insufficient to deter the defendant from continuing the . . . behavior." *Id.* at *3 (alteration in original) (quoting *Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339, 351 (Cal. 2007)). In that event, the court may enjoin the defendant from repeating the defamatory statements, but the injunction must be "limited to prohibiting

the defendant from repeating or republishing the statements found to be defamatory." *Id.* Accordingly, the court enjoined the defendant from "continued or repeated publishing of the statements contained in Trial Exhibits 19 and 20 that were found by the jury to be defamatory." *Id.*

### B. Analysis

Stone has shown through her conduct a single-minded intent to destroy Lustig professionally and personally. As such, the Undersigned finds that the damage awards recommended above are insufficient to provide Lustig with a complete remedy for Stone's defamation. In particular, the Undersigned notes that none of Stone's defamatory internet postings about Lustig have been taken down and they continue to damage his reputation and may cause him to lose additional business beyond the one $200,000 case he already lost as a result of the postings.

Accordingly, the Undersigned recommends that Stone be (1) ordered to cause the internet postings found in Trial Exhibits 1, 2, 3, 5, 19, 25, and 30 to be taken down immediately, and (2) permanently enjoined from continued or repeated publishing of the statements contained in those Trial Exhibits.

### V. CONCLUSION

Based upon the foregoing, the Undersigned **respectfully recommends** that the District Court award Lustig $700,000 in compensatory damages and $1 million in punitive damages, for a total award of $1.7 million, to bear interest from the date of the

17

final judgment. The Undersigned also **respectfully recommends** that the District Court (1) order Stone to cause the internet postings found in Trial Exhibits 1, 2, 3, 5, 19, 25, and 30 to be taken down, and (2) permanently enjoin Stone from continued or repeated publishing of the statements contained in those Trial Exhibits.

VI.  OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule 4(b), the Parties have 14 days after being served with a copy of this Report and Recommendations to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Court Judge. Each Party may file a response to the other Party's objection within 14 days of the objection. Failure to file timely objections to the Report and Recommendations shall bar the Parties from a de novo determination by the District Court of an issue covered in this Report and Recommendations and bar the Parties from attacking on appeal the factual findings contained herein. *United States v. Keelan*, 786 F.3d 865, 872 (11th Cir. 2015) (citing *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993)).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, August 18, 2015.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All counsel of record

Barbara Stone
101 N. Ocean Drive #752
Hollywood, FL 33019
212-994-5482
PRO SE